## WHITEHILL SAND & GRAVEL CO. v. STATE TAX COMMISSION

No. 6667. Decided July 18, 1944. (150 P. 2d 370.)

See 37 C. J. Licenses, Sec. 116. What amounts to a sale at retail within tax statute, note, 139 A. L. R. 372. See, also, 47 Am. Jur. 228.

BEVERLY S. CLENDENIN, of Salt Lake City, for plaintiff.

W. L. SKANCHY and WAYNE CHRISTOFFERSON, both of Salt Lake City, for defendant.

McDONOUGH, Justice.

This is a proceeding to review the deficiency assessment of the State Tax Commission. The plaintiff is engaged in business of selling sand and gravel. Plaintiff paid sales tax on the price of gravel at the pit, but in some cases plaintiff either hauled the material to certain points or arranged for transportation, and the Commission held that the haulage charges collected by the seller constituted a part of the purchase price and entered a deficiency assessment thereon covering transactions over a period of three years. There appears to be little if any dispute between the parties as to the meaning of Sec. 80-15-4, U. C. A. 1943, the applicable statute; the dispute appears to be relative to the application thereof to the facts here. In essence, as we view the problem,

the question to be determined is; Was the Commission warranted in treating delivery charges in each instance as part of the purchase price?

Sec. 80-15-4, supra, reads as follows:

"From and after the effective date of this act there is levied and there shall be collected and paid:

"(a) A tax upon every retail sale of tangible, personal property made within the state of Utah, equivalent to two per cent of the purchase price paid or charged, * * *."

Both parties agree that the following quotation from the case of *Bloxom* v. *Henneford,* 193 Wash. 540, 76 P. 2d 586, 587, correctly reflects the meaning of "purchase price" as used in our statute:

"The purchase price, as that phrase is employed in the definition of gross earnings in section 8, c. 180, p. 716, Laws of 1935, means the purchase price paid by the jobber to the person from whom he bought the goods. The cost of transportation to the purchaser's place of business, whether freight, drayage, or other costs paid by the purchaser after he bought the goods, cannot, without doing violence to the language of the statute, be included within the phrase 'purchase price.'

"* * * The costs or charges paid by the jobber to the railroad company or to the refrigerator car company do not come within any fair definition of the phrase 'purchase price'. * * *"

The commission in its brief emphasizes the words "after he bought the goods" in such quotation.

In the case of *Ford J. Twaits Co.* et al. v. *Utah State Tax Commission,* 106 Utah 343, 148 P. 2d 343, 345, involving in part, the inclusion, in fixing the amount of a use tax, of the cost of transporting the property purchased from a place of purchase without the state to the point of use in this state, we stated:

"The question is then whether the freight paid by contractors is a part of the sale price, being included as a service cost, or 'other expenses.' From the evidence in the record it could not be so. The commission's audit of contractors' books shows that all freight charges were paid by contractors directly to the various carriers by which

goods were shipped. In other words, plaintiff purchased the materials at a price fixed at seller's place of business, took possession thereof and shipped those goods on its own account, and its own risk, paying the freight charges by its own check. How then can the freight charge be a part of the sale price? It is an entirely separate transaction, the sale being complete before shipment ever occurred."

It is clear that if the deficiency here assessed is made up of a percentage of the transportation charges incurred and paid by the purchaser after he took title rather than of items included in the purchase price to him, the assessment must be set aside.

Does the record so show?

The testimony of Mr. Hyde, vice president and manager of appellant, is to the effect that Mrs. King, the office manager, attended to all routine sales but where bids on special contracts were to be considered and contracts entered into he attended to such matters. He testified that the general practice was to quote prices at the pit, since the company had just one truck which it used for deliveries only in case of an emergency; and that while the practice had been for contractors to haul away their own gravel from the pit; when they began to encounter transportation difficulties, they often requested plaintiff to arrange transportation for them. He further testified that the transportation was handled by the company at cost and stated that it was done only as a matter of accommodation and that the company merely acted as representative of the buyers in arranging deliveries at the cost per ton charged by the truckers; and that if the truckers deuanded an increase in delivery charges the company aided the contractors in negotiating a haulage charge which would be agreeable to the purchasers. He further stated that while the truckers collected the delivery charges from the company, the latter in turn collected from the purchasers. While admitting that social security assessments were made against the company for the truckers, he testified that the assessments were paid under protest.

The foregoing involves certain conclusions of the witness relative to the ultimate fact. Excerpts from his testimony more clearly reflect the nature of the arrangements made with the buyers with whom he dealt.

"Q. Let's take the McKee Company. Just relate to the Commission what was done by way of negotiation and final closing of any agreement with that company. A. I discussed the terms with two members of the McKee Company at the Hotel Utah, gave them a quotation, and indicated to them that all of our contracting was based on the sale of material only; that the contractor, himself, handled the drayage either with his own trucks, or he would stipulate the amount that was to be paid to the truckers. We had only one delivery truck of our own. All of our work in the past had been by special contract with the truckers. But the McKee Company, I told them that the price that the men were delivering for at Hill Field was 80 cents per yard; that any increase due to difficulties that might arise, or to shortages of trucking, etc., would have to be borne by their company. There were two gentlement there, and this was agreed upon.

* * * * *

"A. We told them that the price given to us for that haul to Hill Field was 80 cents per yard, and we would give them the cost of material at the pit.

"Q. What was that price? A. When we first started out, it was 60 cents, as I remember it, that we would charge them—60 cents per yard plus 80 cents, which would be the total for the delivered price, and that was agreeable to them. After we started work—

"Q. * * * What did you do about getting haulers then, under that arrangement with McKee? A. We had a good many men that were hauling for us. I met with the men and told them the price of hauling, and they agreed to go on with that price.

"Q. What do you mean, they would agree to go on with that price? A. They had trucks—we had at one time as many as 120 trucks hauling out of our pit, all on straight contracts.

"Q. In other words, these were men that owned a string of trucks, and you contracted with them to do the hauling at so much a yard? A. That is correct.

"Q. Did you do that same thing in regard to the McKee deal? A. Yes.

"Q. All right, go ahead. A. We carried on for a short time at that rate, and then due to competition between the Navy project, and one or two others, the men insisted on an increase.

"Q. You mean these truckers? A. These truckers insisted on an increase. I immediately notified the McKee Company, and I think it was Mr. Jones came down to the pit, and talked to me about that. I told him that the men were asking for 20 cents more and he authorized me to pay that 20 cents more for the hauling. Our base price did not change at that time at all.

"Q. In other words your contract price for the sale of material remained the same? A. That is right.

\* \* \* \* \*

"A. After we completed one of the contracts with the McKee Company, we raised our price, but we still charged him or the men charged through us, the rate of $1 a yard.

"Q. Now, so far as this rate charged by the men for hauling, and that you in turn charged to McKee, did you charge McKee exactly what the men had charged to you for the hauling? A. Exactly. We paid the men just exactly what McKee paid us. There was no commission, no other charge of any kind. I might say that was true of the other companies we dealt with."

The testimony of Mrs. King, office manager, is to the effect that on the invoices sent to the purchaser whenever a transportation charge was involved, the price per yard at the pit and the delivered charge were not shown as separate items; but the sales tax as shown thereon was always based on the pit price and was never computed at 2 per cent of the total charges. Thus, there was collected from the purchaser the total shown as the cost to him at place of delivery, plus 2 per cent of the pit price of the gravel.

She was asked:

"So the invoices would never show gravel at 70c per yard and transportation at $1.00 in any way?

"Not on their invoices, no.

"The only place that would be reflected would be on your books, is that right?

"Yes."

Sample invoices introduced into evidence reflected her testimony.

The auditor of the tax commission testified to having examined two purchase orders. One was for a stated number

of yards of gravel at a price of "f.o.b. Hill Field, [the place of delivery] $1.70." The second read: "Furnish and deliver sand and gravel which we may order to complete the civilian housing project located at Ogden Air Depot, Hill Field, Ogden. Deliveries to be moved in quantities and [as] ordered from the job at the quantity price of $1.70 per cubic yard delivered to the building center."

As to sales made in response to such purchase orders, they would constitute sales of the products at the point of delivery including transportation charges, regardless of the general policy to sell at the pit, unless there was before the commission convincing evidence that acceptance of such orders was pursuant to negotiations subsequently had which resulted in modification of the offer and acceptance so as to establish a contract of sale at the pit. The commission was not in error in concluding that as to such sales, transportation costs were included as part of the sale price.

As indicated hereinabove, the invoices of sales where delivery was involved, carried the pit price plus delivery charge as a single item; for example, so many yards of gravel at $1.70 per yard. However, on those invoices not involving sales thought to be exempt under Sec. 80-15-6 of the act, there is shown an item for sales tax charged to the purchaser computed at 2 per cent of the pit price rather than 2 per cent of the sum which included cost of delivery. Such invoices and the book entries which conformed thereto are consistent with taxpayer's testimony. In the light of the whole record it is unreasonable to infer from such book and invoice entries that the sales thereby evidence were sales at the point of delivery.

Since the great portion, if not all, of the deficiency assessment was bottomed on such inference, and since we are without the information necessary to make any modification thereof, it will be necessary to set aside the order of the Commission and remand the case for rehearing with directions to the Commission to determine the tax deficiency, if any, which accrued by reason of sales made

in response to specific purchase orders which state a unit price at point of delivery, and other sale transactions which may be shown upon rehearing to be of a similar nature. The Commission and the taxpayer may, upon rehearing, introduce additional evidence as to the nature of the various sales transactions involved. Each party shall bear his or its own costs.

WOLFE, C. J., and LARSON and WADE, JJ., concur.

MOFFAT, J., deceased.