[No. 30281. *En Banc.* November 4, 1948.]

ED. THYS *et al.,* Respondents, v. THE STATE OF WASHINGTON, *Appellant.*[1]

[1]Reported in 199 P. (2d) 68.

 

*The Attorney General, Philip W. Richardson* and *Lucile Lomen, Assistants*, for appellant.

*Cheney & Hutcheson*, for respondents.

BEALS, J.—The plaintiffs, Ed. Thys and Albert K. Miller, copartners doing business as Thys & Miller, appealed to the superior court from two tax assessments and from certain orders and decisions of the tax commission of the state of Washington, alleging in their notices of appeal and complaints that the commission had imposed an assessment against plaintiffs for alleged business and occupation taxes and retail sales taxes, purported to have been levied pursuant to Titles II and III of the Revenue Act of 1935, as amended, in the sums of $3,080.37 and $11,772.43 respectively; that plaintiffs had paid the sums claimed as taxes, under protest, and that the taxes were levied without lawful authority and were illegal. Plaintiffs demanded judgment against the state of Washington for the amounts which they contended were illegally levied against them.

The defendant, state of Washington, having filed its answers asserting the legality of the taxes so levied, the two appeals were consolidated, both for hearing before the superior court and for hearing before this court in the event of an appeal.

Trial of the issues presented before the court resulted in the entry of a judgment in plaintiffs' favor for the amounts demanded, and vacating the orders of the state tax commission appealed from. The judgment also enjoined the tax commission from enforcing or collecting any taxes based upon royalties due plaintiffs, and, by way of a declaratory judgment, found that plaintiffs "are not and shall not be liable to the State of Washington for any taxes of any kind or character whatsoever with reference to or by reason of" certain hop-picking machine royalties,

and that plaintiffs were not doing business in the state of Washington.

From this judgment, the state of Washington has appealed, assigning error upon the reversal of the orders of the state tax commission, and upon the entry of judgment against the state for the amounts, plus interest, which respondents had paid under protest. Error is also assigned upon the court's finding that respondents are not doing business in the state of Washington, and upon the court's declaratory judgment that certain sums collected by respondents by way of royalties are not taxable by the state of Washington.

Respondents are copartners engaged in business in Sacramento, California, as manufacturers and vendors of hop-picking machines. They own certain United States patents and licenses of other patents covering such machines, and sell the machines covered by these patents within the state of Washington and elsewhere.

In brief, respondents' business operations in the state of Washington may be described as follows: During the year 1940, William Gamache, a hop grower residing in Yakima county, visited California and saw in operation the hop-picking machines manufactured by respondents. Respondents delivered to him two of these machines, which Gamache tested in his hop fields and which he purchased, finding them satisfactory. Other hop growers in the vicinity became interested in respondents' hop-picking appliances, and consulted Lindeman Power Equipment Company (hereinafter referred to as Lindeman), a manufacturer of farm machinery in Yakima, the management of the company becoming interested in respondents' machines.

In the fall of 1940, after some negotiations, respondents entered into a contract with Lindeman, which was thereafter renewed from year to year, with some modifications. Several of these agreements are in evidence, and, from that dated November 1, 1944, which is fairly typical of all of them, we summarize the contract as follows: Respondents are named in the agreement as first parties, and the Lindeman corporation as second party. First is stated a list of

the patents owned or controlled by respondents, then the parties agree upon the number of machines to be manufactured during the following year, in preparation for sale for the hop-picking season, on or before August 1, 1945. Pertinent paragraphs of the agreement read as follows:

"(3) First party shall pay to the second party the full amount of the price received from the grower purchaser for each of the machines manufactured for the 1945 harvest, less the amount specified as a compensation in Paragraph 12, namely $500.00. The sale price to the grower for the 1945 season shall be not less than $6,000.00 nor more than $6,350.00 per machine unless mutually agreed upon between the parties hereto.

"(4) Design of the machines to be manufactured may be altered as mutually agreed upon.

"(5) Second party shall maintain records and accounts relative to its manufacture of said machines and shall make such records and accounts available to first party, and shall report expenses, materials on hand, and progress of construction as first party may demand."

"(8) Second party at its cost or expense shall carry full and adequate insurance upon said machines and/or any equipment, material or part thereof while in or upon its premises, payable in event of damage, destruction, or loss to first party, against damage, destruction, or loss by fire and other casualty.

"(9) Title of each said machine while in course of construction and when completed, and title to all equipment, materials and parts purchased to be used as part or parts of each said machine shall vest and remain in first party; and second party shall not convey title nor effect delivery of any said machine to any other person, firm or corporation without express authority of first party.

"(10) First party shall inspect and test each said machine when completed and ready for delivery, and, if said machine be found satisfactory, shall accept said machine and pay therefor the agreed upon price or any theretofore unpaid balance thereof; but such inspection, testing, acceptance and payment shall not constitute a waiver of the warranty of second party contained in paragraph 7 hereof.

"(11) Second party shall complete and make ready for delivery said machines on or before August 1, 1945. If, in the opinion of first party, it shall become necessary in order to effect delivery of any said machines for which first party

shall be obligated, that it manage and direct the manufacture of said machines in whole or in part, second party shall permit first party to use its plant, property, equipment, tools, labor, and such materials as may then be available for the completion of any said machines then under construction, at the cost or expense of second party, and second party shall pay to first party two hundred dollars ($200.00) for each month or major fraction thereof during which first party may manage and direct the manufacture of any said machines.

"(12) Second party shall pay to first party Five Hundred Dollars ($500.00) for each said machine manufactured under this agreement, in consideration whereof first party shall render services as consulting and supervising engineers in connection with said manufacture and shall devote to said services as much time as shall be feasible and reasonable in view of the necessity for such services and of the requirements of the other businesses of first party. First party shall defray travelling and living expenses in connection with these services from said payments."

"(14) Any loans made to second party by first party shall be used solely for the preparation to manufacture said machines or for the purchasing of materials or parts or for labor, and said funds so loaned shall not be commingled with or become a part of the funds of second party and second party will disburse said moneys so loaned to it from a separate bank account with the Seattle-First National Bank, Yakima Branch, Yakima, Washington.

"(15) First party will loan to second party for the purpose of assisting in the construction of machines, such sum of money as may be agreed upon from time to time between the parties hereto, being at all times, however, of sufficient amount to properly finance said manufacturing work and the purchase of materials therefor, and from time to time to make such additional loans as may be necessary."

Other paragraphs of the agreement provide that Lindeman should handle or manufacture necessary parts to keep the hop-picking machines in repair, and have available at all times skilled repair servicemen to work on the machines. Lindeman was required to furnish respondents, on request, estimates as to current cost of construction of the machines, and loans from respondents to Lindeman were to be canceled *pro rata* as the machines were constructed. Linde-

man was to pay social security or industrial insurance charges, and agreed to assign to respondents all patents, if any, which might be issued to Lindeman or to any of its employees in connection with any invention or improvement to hop-picking machines.

Concerning the method followed by the parties in carrying out the agreement above referred to, the evidence discloses the following: Near the close of a hop-picking season, in September or October, respondents would seek orders from hop growers for machines to be manufactured by Lindeman and to be delivered prior to the opening of the next season. Respondents would contact some hop growers, and Lindeman others. Respondents prepared the blank forms to be used by purchasers ordering the machines. Upon accomplishment of a contract, Lindeman would forward it to respondents for approval, and the contract, if approved and executed by respondents, would be returned to Lindeman for delivery to the purchaser.

By December of each year, Lindeman would commence the manufacture of machines ordered for the next season. A few machines were made to be sold outside the state of Washington, but, apparently, it is not contended by appellant that such sales are subject to taxes to be paid to the state.

The entire manufacturing process was financed by respondents, who deposited money in a Yakima bank, from which account Lindeman would draw for the necessary expenses connected with the construction of the machines. By the agreement, funds in this account were not to be commingled with Lindeman's funds, and payments made to Lindeman by way of purchase price for the machines were deposited in this account.

Approximately fifteen per cent of the parts required for the construction of the machines was shipped by respondents from their California office to Lindeman. Such parts were charged, but not sold, to Lindeman, and respondents received from the account in the Yakima bank (in other words, from their own funds) the amount of the bills rendered to Lindeman by respondents for these parts. The

other parts necessary for the manufacture of the machines were manufactured or purchased in the open market by Lindeman, payments therefor being made from the same bank account.

Testimony introduced by respondents discloses that the machines being constructed by Lindeman were inspected at the latter's plant, generally by respondent Thys.

Lindeman kept a supply of parts for the repair of the machines, most, if not all, of such parts being purchased from respondents and paid for by Lindeman out of its own funds. The parts and work connected with repairing the machines were charged by Lindeman to the purchasers, and by them paid to Lindeman.

Purchasers of the hop-picking machines, under installment contracts, made the required payments either to respondents or to Lindeman, the entire purchase price of the machine having generally been paid by the purchaser on or prior to delivery.

A definite price was fixed for the sale of the machines to the purchasers, and from that price all expenses incurred in the course of construction were deducted, including the amount of five hundred dollars specified as compensation for engineering services rendered by respondents. The balance of the price paid by the purchaser of the machine was retained by Lindeman as compensation for its work on that machine.

Upon the sale of each machine manufactured by Lindeman and sold from its plant, respondents charged to and collected from the purchaser the three per cent sales tax provided for by a statute of this state, and, upon the same basis, respondents computed and paid the business and occupation tax due under our statutes.

The machines were sold pursuant to a written contract between respondents, as first parties, and the purchaser. From time to time, some changes were made in these contracts, but the essential conditions remained the same, the alterations concerning the amounts to be paid by the purchaser.

These sales contracts stated the right of respondents, under designated patents, to sell the hop-picking machine and to license the purchaser to use the same, and described the sale from respondents to the purchaser, who agreed to pay the basic price of the machine and "all sales taxes and other excise taxes payable on the sale" thereof. The purchaser also agreed to assume, for respondents' benefit, all obligations pertaining to the use of the machine, including the payment of "license" fees or "royalties" provided for in the contract, and to execute in favor of respondents a chattel mortgage or other acceptable security, if called for by the contract; title to the machine to vest in the purchaser upon payment by him of the full amount of the purchase price, and the sales and excise taxes referred to above, together with delivery of any chattel mortgage called for by the contract.

Paragraph No. 6 of the contract reads, in part, as follows:

"It is expressly understood that the sale of said machines is without the right to use said machines, and that in order to use said machines Second Party must secure from First Party a license to use said machines, and that the continuing right to use said machines is strictly conditioned upon the full and faithful performance of such license; wherefore, First Party hereby grants to Second Party a non-exclusive, indivisible and non-transferable license, as long as the terms hereof be fully and faithfully performed and maintained, to use said machines, for the purpose for which said machines were designed, under the following United States Letters Patent: . . . ,"

followed by a description of the patents pursuant to which the machine was made and sold.

By paragraph No. 7, respondents granted to the purchaser,

". . . strictly subject to the full and faithful performance of the terms and all thereof of this agreement, a non-exclusive, indivisible and non-transferable license to use and enjoy, in connection with hop picking and separating operations of Second Party, the methods and processes disclosed and claimed in United States Letters Patent [describing the patent]."

Paragraph No. 8 of the contract reads, in part, as follows:

"For and in consideration of the licenses and each thereof, set forth in Paragraphs VI and VII hereinabove, Second Party agrees to pay to First Party a royalty of Five Dollars ($5) per two hundred (200) pounds of dried hops harvested by machines purchased by Second Party, said royalty being payable when the amount of bales picked is determined or on or before the 15th day of October of each year during the term hereof, for all hops harvested during the preceding twelve (12) calendar months. In any event, the minimum royalty payable hereunder shall be Five Hundred Dollars ($500) per machine per annum, and if the royalties computed at the rate of Five Dollars ($5) per two hundred (200) pounds of hops harvested shall not aggregate as much as Five Hundred Dollars ($500) for each machine in each period of twelve (12) calendar months herein referred to, said sum of Five Hundred Dollars ($500) per machine shall nevertheless be paid to First Party by the following October 15th."

By paragraph No. 10, the purchaser agreed to deliver to respondents, on or before a certain date, statements showing the amount of "royalties" payable on the machine purchased, and the manner in which the amount was computed, and further agreed that respondents should have free access at all times to inspect the machine and determine the amount of hops harvested thereby, and should also have the right to examine the purchaser's records, for the purpose of determining the amount of "royalties" due respondents.

The contract provided that the term of the license thereby granted should be seventeen years from the date of the contract; that the purchaser conceded the validity of all letters patent licensed by the contract, and that respondents would furnish, at the place the machine was manufactured, necessary replacement parts for which the purchaser would pay. The contract contained other provisions usually included in contracts providing for payment of the purchase price in installments.

During the hop-picking season, the quantities of hops picked by each machine were checked on behalf of respond-

ents by their agent, William Gamache, of Yakima, who, for his services, received twenty per cent of the amounts paid by the purchaser of each machine pursuant to paragraph No. 8 of the contract, *supra*. Apparently, the amount paid by the purchaser of the machine by way of "royalty" for the privilege of using the same varied somewhat, but any such variation is immaterial here.

The question before us for determination is whether the moneys received by respondents, referred to in the contract as "royalties," paid by the respective purchasers of the hop-picking machines, are taxable under the revenue statutes of this state. Respondents argue that such payments do not constitute any portion of the selling price of the machine, and that such payments, made by the purchaser thereof to respondents, who are nonresidents of the state of Washington, are not taxable under the statutes of this state. Respondents contend that the attempted collection of such a tax would be unconstitutional, as a levy upon interstate commerce or as deprivation of property without due process of law.

It is admitted that respondents, as copartners, reside in the state of California, where they maintain their office and also a manufacturing plant. They contend that no agent of Lindeman ever had any authority to sign any contract on behalf of respondents, and that the relationship existing between respondents and Lindeman was that of independent contractors.

It appears that, due to the war, the demand for hop-picking machines was so great that no solicitation was necessary in order to find purchasers, and that the demand, during the years in question, exceeded the supply.

Under the terms of the contract between respondents and the respective purchasers of the machines, the machines were sold within the state of Washington for a stated amount, upon which the retail sales tax was paid. It appears from the contract, *supra*, that the purchaser, upon payment of the price of the machine, obtained no right to use the same for the purpose for which it was constructed and bought, but that that right was granted by the con-

tract upon payment of certain specified sums, including a minimum of five hundred dollars (sometimes less) per season, regardless of whether the machine was used at all or picked a sufficient number of pounds of hops to require the payment of five hundred dollars, according to the scale provided for in the contract.

The tax commission of the state of Washington, in the first instance, levied against respondents the service tax of one half of one per cent, pursuant to Rem. Supp. 1943, § 8370-4 [P.P.C. § 965-1], in the amount of $3,080.37, which respondents paid under protest.

Thereafter, the tax commission imposed a three per cent sales tax on the amounts collected by way of royalties, pursuant to Title III of the Revenue Act of 1935, as amended, plus a one quarter of one per cent occupation tax, under Title II thereof, in the additional sum of $11,772.43, which respondents also paid under protest. These two tax impositions were the subject matter of the appeal to the superior court from the rulings of the tax commission in the case at bar.

One question before us concerns the nature of the payments made by purchasers of the machines to respondents, referred to in the contracts of sale for the machines as "royalties."

It is apparently conceded by appellant that, if these payments are, in fact, royalties for use of a patented appliance paid by a resident of this state to a nonresident, such payments are not taxable pursuant to the laws of the state of Washington. On the other hand, appellant contends that, under the circumstances shown, such payments made to respondents constitute part of the purchase price of the machine, and, as such, are taxable in this state.

Appellant also contends that respondents, as copartners in conducting business as heretofore set forth, are engaged in business within this state, while respondents' contention is to the contrary.

There is little, if any, dispute concerning the facts.

Appellant, in its statement of matters involved upon this appeal, includes, first, the question of the "royalties"

payable to the respondents under their contracts for the sale of the machines, *supra*, and whether the payments of such royalties by the purchasers, in fact, constitute part of the purchase price of the machines; and, second, whether or not respondents, under the evidence, should be held to be engaged in business in the state of Washington.

Respondents, in their brief, contend that they have not engaged in business in Washington, and state that the question to be determined herein is whether the payments made by way of "royalties" are taxable, pursuant to the statute providing for the collection of a sales tax.

Apparently, there is some dispute between the parties as to the amounts due from respondents by way of taxes, if appellant's position is correct and, under the statutes of this state, respondents are liable to pay taxes upon the "royalties" received. There is a dispute as to the amount of $238.33, a one quarter of one per cent business tax levied against respondents, computed upon the value of machine parts delivered by respondents to Lindeman and used in the manufacture of the hop-picking machines.

The following statutes of this state are among those relied upon by appellant in seeking to enforce the state's claim for sales taxes against respondents:

Laws of 1935, chapter 180, p. 706 (Rem. Rev. Stat. (Sup.), § 8370-1 [P.P.C. § 961-1]), referred to as the "Revenue Act," as amended, provides for the payment of an excise tax, based upon the selling price of an article of tangible personal property sold under the circumstances requiring that the tax be paid.

Laws of 1939, chapter 225, § 7, p. 989 (Rem. Rev. Stat. (Sup.), § 8370-17 [P.P.C. § 982-5]), defines a selling price as follows:

"For the purposes of this title, unless otherwise required by the context:

"(a) The term 'selling price' means the consideration, whether money, credits, rights, or other property, expressed in the terms of money, paid or delivered, by a buyer to a seller, all without any deduction on account of the cost of tangible property sold, the cost of materials used,

labor costs, interest, discount, delivery costs, taxes or any other expenses whatsoever paid or accrued and without any deduction on account of losses; . . ."

The following sections of chapter 178, Laws of 1941, should be considered in connection with the questions here presented:

Laws of 1941, chapter 178, § 1, p. 480 (Rem. Supp. 1941, § 8370-4 [P.P.C. § 965-1]), reads, in part, as follows:

"From and after the first day of May, 1935, there is hereby levied and there shall be collected from every person a tax for the act or privilege of engaging in business activities. Such tax shall be measured by the application of rates against value of products, gross proceeds of sales, or gross income of the business, as the case may be, as follows: . . .

"(b) Upon every person engaging within this state in business as a manufacturer; as to such persons the amount of the tax with respect to such business shall be equal to the value of the products manufactured, multiplied by the rate of one-quarter of one per cent;

"The measure of the tax is the value of the products so manufactured regardless of the place of sale or the fact that deliveries may be made to points outside the state;

"(c) Upon every person engaging within this state in the business of making sales at retail; as to such persons, the amount of tax with respect to such business shall be equal to the gross proceeds of sales of the business, multiplied by the rate of one-quarter of one per cent; . . .

"(e) Upon every person except persons taxable under subsection (d) above engaging within this state in the business of making sales at wholesale; as to such persons the amount of tax with respect to such business shall be equal to the gross proceeds of sales of such business multiplied by the rate of one-quarter of one per cent; . . ."

Laws of 1941, chapter 178, § 2, p. 482 (Rem. Supp. 1941, § 8370-5 [P.P.C. § 965-3]), provides, *inter alia*:

"For the purposes of this title, unless otherwise required by the context: . . .

"(c) The word 'sale' means any transfer of the ownership of, title to, or possession of property for a valuable consideration and includes any activity classified as a 'sale at retail' or 'retail sale' under sub-section (d) of this section. It includes conditional sale contracts, leases with

option to purchase, and any other contract under which possession of the property is given to the purchaser but title is retained by the vendor as security for the payment of the purchase price. It shall also be construed to include the furnishing of food, drink, or meals for compensation whether consumed upon the premises or not; . . .

"(f) The term 'gross proceeds of sales' means the value proceeding or accruing from the sale of tangible personal property without any deduction on account of the cost of property sold, the cost of materials used, labor costs, interest, discount paid, delivery costs, taxes, or any other expense whatsoever paid or accrued and without any deduction on account of losses; . . .

"(h) The term 'value proceeding or accruing' means the consideration, whether money, credits, rights or other property expressed in terms of money, actually received or accrued. The term shall be applied, in each case, on a cash receipts or accrual basis according to which method of accounting is regularly employed in keeping the books of the taxpayer. The Tax Commission may provide by regulation that the value proceeding or accruing from sales on the installment plan under conditional contracts of sale may be reported as of the dates when the payments become due; . . .

"(j) The word 'manufacturer' means every person who, either directly or by contracting with others for the necessary labor or mechanical services, manufactures for sale or commercial use from his own materials or ingredients any articles, substances or commodities. When the owner of equipment or facilities furnishes, or sells to the customer prior to manufacture, all or a portion of the materials that become a part or whole of the manufactured article, the Tax Commission shall prescribe equitable rules for determining tax liability;

"(k) The term 'to manufacture' embraces all activities of a commercial nature wherein labor or skill is applied, by hand or machinery, to materials so that as a result thereof a new, different or useful article of tangible personal property or substance of trade or commerce is produced and shall include the production or fabrication of special made or custom made articles; . . ."

Laws of 1941, chapter 178, § 9, p. 494 (Rem. Supp. 1941, § 8370-25 [P.P.C. § 982-21]), reads as follows:

"In the case of installment sales and leases with an option to purchase, the Commission, by regulation, may provide

for the collection of taxes upon the installments of the purchase price, or amount of rental, as of the time the same fall due.

"In case the consideration for the lease with an option to purchase is not a bona fide consideration or does not represent a reasonable charge therefor, or if the agreement designated as a lease with an option to purchase is in fact not a true lease with an option to purchase, the Tax Commission shall issue equitable rules and regulations for the proper classification of such transaction.

"The Tax Commission, by general regulation, may provide that a taxpayer whose regular books of account are kept on a cash receipts basis may file returns based upon his cash receipts for each bimonthly period and pay the tax herein provided upon such basis in lieu of reporting and paying the tax on all sales made during such period."

The trial court held that respondents were not subject to the taxes levied against them because respondents were not doing business in the state of Washington. In this connection, the true nature of the "royalties" payable to respondents under the contracts of sale of the hop-picking machines, is a material element to be considered in deciding the questions presented on this appeal. We shall consider first the subject matter and nature of the contracts of sale whereby respondents sold the machines.

The contracts entered into between respondents and their vendees covered sales of the hop-picking machines constructed pursuant to United States patents granted to respondents or their licensors.

Respondents rely upon the case of *Thys v. Rivard,* 25 Wn. (2d) 345, 171 P. (2d) 255, and the same case, on a later appeal, after a retrial, 29 Wn. (2d) 502, 187 P. (2d) 952. In the case cited, the question to be determined was whether or not Rivard, who had purchased an unpatented appliance from respondents, had used the appliance in a hop-picking machine which he constructed and which respondents contended infringed patents controlled by them. The case, on neither appeal, is in point here.

The case at bar concerns complete, patented, hop-picking machines sold by respondents. Of course, the purchasers of the machines bought them to use in harvesting their hops.

■ The right to use an article is one of the most valuable elements of a property right therein, and, of course, this right to use becomes of particular importance in connection with patented appliances. Had respondents sold their hop-picking machines for a fixed amount, without any provision as to the right of the purchaser to use the same, any purchaser would obtain the implied right to use the patented machine for the purpose for which it was constructed, without paying any compensation other than the purchase price. Of course, in such a case, the purchase price would be based not alone upon cost plus profit but would include a sum estimated to compensate for the value of the use of the patented appliance. Ellis, Patent Assignments and Licenses (2d ed.) 552, § 498.

In 2 Walker on Patents (Deller's ed.) 1461, § 366, the rule is stated, as based upon the maxim of the common law, to the effect that anyone granting a thing impliedly grants that without which the thing expressly granted would be useless to the grantee.

Of course, many owners of or dealers in patented appliances frequently fix a selling price for the article and, in addition, provide for the payment to the seller of additional sums for the use of the appliance sold. These payments may be fixed amounts accruing at stated periods or amounts to be determined by the use of the machine.

These principles have been discussed and approved in many cases, including the following:

In *Keeler v. Standard Folding Bed Co.*, 157 U. S. 659, 39 L. Ed. 848, 15 S. Ct. 738, the court said:

"Where the patentee has not parted, by assignment, with any of his original rights, but chooses himself to make and vend a patented article of manufacture, it is obvious that a purchaser can use the article in any part of the United States, and, unless restrained by contract with the patentee, can sell or dispose of the same. It has passed outside of the monopoly, and is no longer under the peculiar protection granted to patented rights. As was said by Mr. Justice Clifford, in *Goodyear v. Beverly Rubber Co.* (1 Cliff. 348, 354): 'Having manufactured the material and sold it for a satisfactory compensation, whether as material or in the form of a

manufactured article, the patentee, so far as that quantity of the product of his invention is concerned, has enjoyed all the rights secured to him by his letters patent, and the manufactured article, and the material of which it is composed, go to the purchaser for a valuable consideration, discharged of all the rights of the patentee previously attached to it, or impressed upon it, by the act of Congress under which the patent was granted.' "

In *Henry v. A. B. Dick Co.*, 224 U. S. 1, 56 L. Ed. 645, 32 S. Ct. 364, Ann. Cas. 1913D, 880, appears the following:

"An absolute and unconditional sale operates to pass the patented thing outside the boundaries of the patent, because such a sale implies that the patentee consents that the purchaser may use the machines so long as its identity is preserved. This implication arises, first, because a sale without reservation, of a machine whose value consists in its use, for a consideration, carries with it the presumption that the right to use the particular machine is to pass with it. The rule and its reason is thus stated in Robinson on Patents, § 824: 'The sale must furthermore be unconditional. Not only may the patentee impose conditions limiting the use of the patented article, upon his grantees and express licensees, but any person having the right to sell may at the time of sale restrict the use of his vendee within specific boundaries of time or place or method, and these will then become the measure of the implied license arising from the sale.'

"The argument for the defendants ignores the distinction between the property right in the materials composing a patented machine, and the right to use for the purpose and in the manner pointed out by the patent. The latter may be and often is the greater element of value, and the buyer may desire it only to apply to some or all of the uses included in the invention. But the two things are separable rights. If sold unreservedly the right to the entire use of the invention passes, because that is the implied intent; but this right to use is nothing more nor less than an unrestricted license presumed from an unconditional sale."

The case last cited was modified in the later case of *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U. S. 502, 61 L. Ed. 871, 37 S. Ct. 416, Ann. Cas. 1918A, 959, L. R. A. 1917E, 1187, but the latter case does not affect the principle referred to in the foregoing quotation.

In the case of *Bauer & Cie v. O'Donnell*, 229 U. S. 1, 57 L. Ed. 1041, 33 S. Ct. 616, Ann. Cas. 1915A, 150, L. R. A. (N.S.) 50, 1185, where it appeared that a patented article had been sold for a fixed amount, with a notice reserving the right to fix the price at which the article might be resold by the vendee, the court held that such a provision was ineffective, saying:

"The packages were sold with as full and complete title as any article could have when sold in the open market, excepting only the attempt to limit the sale or use when sold for not less than one dollar. In other words, the title transferred was full and complete with an attempt to reserve the right to fix the price at which subsequent sales could be made. There is no showing of a qualified sale for less than value for limited use with other articles only, as was shown in the *Dick Case*. There was no transfer of a limited right to use this invention, and to call the sale a license to use is a mere play upon words.

" . . . This being so, the case is brought within that line of cases in which this court from the beginning has held that a patentee who has parted with a patented machine by passing title to a purchaser has placed the article beyond the limits of the monopoly secured by the patent act."

There are other authorities to the same effect. It is, of course, true that the authorities above cited all concerned the validity of covenants in a contract of sale of a patented article, restricting the use of the appliance sold, and are not directly in point upon the question here presented. However, the language used by the courts in deciding these cases has some bearing upon the question of whether or not some right on the part of the vendor of a patented machine to receive from his vendee, in addition to the purchase price of the machine fixed by the contract, additional payments for the use of the machine, amounts to a contract to pay royalties, in the technical sense, as used in connection with patent law, or is, on the other hand, when considered from a different point of view, as in the case at bar, a substantial part of the purchase price.

Respondents sold their patented hop-picking machine for a cash price, based, apparently, upon the cost of production

plus a maker's profit. Of course, it is possible that respondents were themselves paying license fees or royalties to the holder of a patent or patents covering portions of the machines which respondents sold.

Pursuant to the contract between respondents and the purchaser, the latter obtained title to the machine, subject to the restrictions in the contract above quoted; this without the payment of any amount for the use of the machine. However, the sale of the machine to the purchaser was without the right to use the same, and, to acquire that right, the purchaser agreed to secure from respondents a license to use the machine and agreed to pay therefor certain sums described in the contract and referred to as "royalties." By the contract, the purchaser agreed to pay a fixed sum each year, generally five hundred dollars, whether his machine was used in the picking of hops or not, and a larger amount if, according to the agreement, the machine picked in excess of a certain number of pounds of hops.

It appears, then, that the difference between the actual sale value of the machine, when used for the purpose for which it was made and bought, and the money actually paid for the machine on delivery, was to be compensated in respondents' favor by the payment of the so-called "royalties."

The "royalties," which, at face value, would exceed the purchase price of the machine, were an important and, to respondents, an essential part of the sale. Apparently, that was almost the entire profit on the deal accruing to respondents.

This action concerns the claim of the state of Washington against respondents for taxes which the state has levied against them. No possible question between respondents and any of their vendees is pertinent to this inquiry. In selling their hop-picking machines, the respondents divided their contracts into two parts, first, the sale of the machine without the right to use it, and, second, the right to use the machine for the purpose for which it was constructed and purchased. There can be no objection to this procedure on the part of respondents; but if, in the light of the statutes

of this state providing for the payment of sales taxes and similar exactions, and pertinent legal principles, it appears that all of the sums payable to respondents by the purchaser of the machine are, in fact, payments for the machine, the state is entitled to collect appropriate taxes thereon.

Under the circumstances here shown, the so-called "royalties," in so far as the payment of five hundred dollars a year are concerned, are, in effect, a part of the cost of the machine and of the right to use the same to the purchaser. The minimum payment of five hundred dollars a year (or some other sum) required in any event is, in effect, a payment simply for the right to use the machine and is not based upon any actual use thereof, which right, joined with ownership, results in a complete, unrestricted title to own and use the machine.

By the contracts for the sale and purchase of the machines, the purchaser agreed to pay a fixed price for the machine and further payments of not less than five hundred dollars a year for seventeen years. For the purposes of this case, each contract must be considered by its four corners. While the amount paid by the purchaser at the time of the execution of the contract doubtless fairly represented the cost of the machine and a reasonable maker's profit for the material and work required to build a machine, if taxes upon the amounts to be paid subsequently by the purchaser may be avoided by the method used, a vendor might, by a contract similar in substance, sell a machine, without the right to use it, for much less than its cost, and, by providing for the payment of "royalties," receive the greater portion of the cost of the machine by way of such payments.

The contract between respondents and the purchasers of their machines requires that the purchaser pay all state taxes accruing because of the sale and purchase of the machine.

Of course, situations may easily be imagined in connection with which a royalty paid for use of a machine would have nothing to do with the sale of any property whatsoever. For example, if a citizen of this state should build a machine

and be using it, and if it should develop that the machine infringed upon some valid patent, the owner of the patent would be entitled either to stop the use of the machine or receive money by way of a license or royalty, on account of the continued use of the appliance.

In the case at bar, while title to the machine itself passed from respondents to the purchaser upon payment of the purchase price named as such in the contract, the purchaser thereby obtained no more than bare title to the machine, without the right to use it, and respondents, by that portion of the contract, did not receive the value of the machine as a patented article of merchandise. It is reasonable to suppose that the sale of a mechanical device, intended for use, should, and is intended to, not only pass title to the machine but also convey the right to use it in the manner and for the purpose for which it was constructed. While the annual payments reserved to respondents by the contract are therein referred to as "royalties," such payments, together with the so-called purchase price of the machine, are, as a matter of fact, when taken together, the amount paid by the purchaser for the complete and unqualified title to the hop-picking machine purchased.

In the case of *Klickitat County v. Jenner*, 15 Wn. (2d) 373, 130 P. (2d) 880, we said:

"Clearly, the legislature intended that, in any taxable transaction, as in the case of the ordinary and conventional retail sale of personal property, the measure of the tax is to be the cost to the buyer or consumer, and not the cost to the seller."

While the facts in the case cited differ radically from those in the case at bar, the foregoing quotation is pertinent to the situation here presented.

In *Philadelphia v. Heinel Motors, Inc.*, 142 Pa. Super. Ct. 493, 16 A. (2d) 761, appears the following:

" 'The sales tax is imposed on the purchaser or consumer; . . . .' The tax being a tax on the purchaser measured by the amount of the purchase, it is clear that the medium of payment agreed upon is immaterial. In other words, when the dealer in automobiles sells two new automobiles, each

for the same price, accepting (a) cash from one customer for the automobile, and (b) personal property at an agreed valuation from another customer, either in complete or partial payment of the purchase price, both purchasers ought to pay the same amount of tax since they are buying identical merchandise and have agreed to pay the same price."

If the owner of a patented mechanical device should sell a machine to A for ten thousand dollars cash, with the unrestricted right to use the device, and sell an identical machine to B for six thousand dollars, the contract providing for the payment of "royalties" in the amount of four thousand dollars, it would seem that the same rule for the application of the sales tax should apply to both sales.

In the case of *Rotorite Corp. v. Commissioner of Internal Revenue,* 117 F. (2d) 245, it appeared that a patentee granted to a manufacturer a license to make appliances covered by the patent, in consideration of the payment of a royalty and an option to purchase the patent, and, in the event that the option was exercised, agreed to apply the royalties previously paid on account of the purchase price. Within the time limited, the grantee exercised the option and purchased the patent. It was held that payments previously made by way of royalties became purchase-money payments, and not royalties taxable as income. In the course of the opinion appears the following:

"It has often been said, 'Taxation * * * is eminently practical.' *Tyler v. United States,* 281 U. S. 497, 503, 50 S. Ct. 356, 359, 74 L. Ed. 991, 69 A. L. R. 758. We must look through the form to the substance of the transaction."

In the case of *State ex rel. Attorney General v. Halliday,* 61 Ohio St. 352, 56 N. E. 118, 49 L. R. A. 427, the court considered the matter of the taxation of hand telephones and transmitters, which were held by the taxpayer under lease from the American Bell Telephone Company, the lessor holding the title and receiving royalties for the use of the patented appliances. The state levied a property tax against the lessee on account of the value of the telephones, and the question before the court was the determination of the value

of the appliances for taxation purposes. The taxpayer contended that only the physical value of the instruments should be considered, independent of their use value. It was held that, where an article of tangible personal property is protected by a patent and not on the market for sale, but its ownership retained by the manufacturer and leased, the property in the possession of the lessee should be taxed at its true value in money, including its enhanced value by reason of the patent. In the course of the opinion, the court said:

"The value of the article itself is the same whether it remains in the hands of the owner of the patent or has been sold by him to another. The state should not be required to pause before taxing an article of tangible personal property found in its borders to ascertain whether it was the fruit of some patented process or combination or not. A mowing machine is taxed at its value in money although that value may consist largely of a patented combination. It would be impossible to ascertain what proportion of the entire value was due to the patented combination, and if it could not be taxed upon its entire value it could not be taxed at all. And this is true of all articles the manufacture of which involves the application of any process or combination covered by a patent; so that if an article cannot be taxed on the value which accrues to it by reason of its being patented, a large and valuable proportion of the property in the state will be withdrawn from taxation altogether.

"These views find support in a considerable number of authorities, among which are: *Webber v. Virginia*, 103 U. S., 344; *Commonwealth v. C. D. & P. Telephone Co.*, 145 Penn. St., 121; *Patterson v. Kentucky*, 97 U. S., 501, 503."

In 51 Am. Jur. 303, Taxation, § 248, is found the following:

"It is also a long-established rule that a patented article may be taxed as tangible personal property at its full market value, although its value is enhanced by reason of the patent."

Respondents rely upon the opinion of the United States circuit court for the southern district of Ohio in the case of *United States v. American Bell Tel. Co.*, 29 Fed. 17. This matter was presented to the court by way of the telephone company's motion to set aside the marshal's return of ser-

vice, and a plea in abatement to the jurisdiction of the court over the telephone company. The circuit court sustained the plea in abatement, holding that the American Bell Telephone Company was not doing business in the state of Ohio, and that the court had not acquired jurisdiction over that corporation.

In brief, it appears that the American Bell Telephone Company was a Massachusetts corporation, having its principal place of business in Boston, and owning telephone patents. The company delivered telephone instruments to lessees in Ohio for the consideration of certain rentals or royalties, granting licenses to the lessees to use the company's patented instruments. The telephones were manufactured in Boston and there delivered to the local corporation users, who paid the company in Boston for the use of the instruments. The telephone company reserved title to the telephones, subject to the right of the lessees or licensees to use them, upon making the agreed payments.

The court held that the American Bell Telephone Company was not doing business in the state of Ohio, and that jurisdiction over that company could not be obtained in Ohio by the Federal court by service of process upon its lessees.

In the case at bar, the hop-picking machines were manufactured within the state of Washington, were sold by respondents while the machines were within this state, and the "royalties" due respondents were collected by respondents' agent within this state. The facts in the case cited differ radically from those in the case at bar, and the case is not here in point.

Respondents also cite the case of *State ex rel. Cruse v. American Can Co.*, 117 Colo. 312, 186 P. (2d) 779, in which the supreme court of Colorado held that a certain class of sales made to residents of that state by a foreign corporation, which maintained an office and warehouse in Colorado, were made by way of interstate commerce and were not subject to taxation by the state. It appeared that the sales made were subject to approval at the home office of the corporation, and

that the goods sold were manufactured without the state of Colorado and delivered to the purchaser at the company's factory. Under the facts upon which the case was decided, the decision is not here in point.

Respondents also cite the case of *United States v. Eastern Underwriters Ass'n*, 322 U. S. 533, 88 L. Ed. 1440, 64 S. Ct. 1162, in which the supreme court held that insurance contracts between residents of different states constituted interstate commerce, under the constitution of the United States. The facts in the case cited are so different from those involved in the case at bar that the decision is not here in point.

■ We hold that, under the contracts whereby respondents sold the hop-picking machines within this state, the so-called "royalties" (referring to the payments of five hundred dollars a year, regardless of the use or nonuse of the machine) are, for the purposes of the statutes of this state providing for the payment of a sales tax, part of the selling price of the machine and taxable as such, and, if respondents were, in fact, within this state engaged in the business of making sales at retail, such reserve payments are a portion of the "gross proceeds" and subject to the business tax, in an appropriate amount. The same is true if respondents are, within this state, engaged in business as a manufacturer, the so-called "royalties" being a portion of the true sale price of the hop-picking machines.

The trial court held that respondents were not subject to the payment of the taxes in question, because they were not doing business in the state of Washington.

It does not appear that respondents ever solicited business in this state. Indeed, the evidence shows that this was unnecessary, as, during the years for which the tax is sought to be collected, the demand for the hop-picking machines was so great that it was impossible to supply the number of machines desired.

■ It is also true, as contended by respondents, that taxing statutes are, in doubtful cases, to be construed in favor of the taxpayer. *Union Trust Co. v. Spokane County*, 145 Wash. 193, 259 Pac. 9.

Counsel for respondents, in his opening statement before the trial court, said:

"The point in dispute here relates primarily, if not entirely, to whether or not the royalties for the use of the patented hop picking machines are taxable in this state. So far as the three per cent sales tax on what we call the original purchase price of the machine is concerned and the one-fourth of one per cent occupation tax, there is no dispute as to that, nor is there any dispute as to the relatively minor items of repair parts which are manufactured in California and shipped to this state, and which are subject to the three per cent compensating tax, and those taxes have been fully paid. The dispute is as to whether or not the royalties are taxable."

Respondents' contracts with their vendees provide that the vendee shall pay the sales tax.

Laws of 1941, chapter 178, § 2, p. 486 (Rem. Supp. 1941, § 8370-5), reads, in part, as follows:

"(m) The word 'business' includes all activities engaged in with the object of gain, benefit or advantage to the taxpayer or to another person or class, directly or indirectly;

"(n) The term 'engaging in business' means commencing, conducting or continuing in business and also the exercise of corporate or franchise powers as well as liquidating a business when the liquidators thereof hold themselves out to the public as conducting such business."

■ In Restatement of the Law of Conflict of Laws 244, § 167, is found the following:

"A foreign corporation can do business through an agent.
"*Comment*:
"*a. What constitutes 'doing business.'* Doing business is doing a series of similar acts for the purpose of thereby realizing pecuniary benefit, or otherwise accomplishing an object, or doing a single act for such purpose with the intention of thereby initiating a series of such acts."

The question of whether a nonresident person or corporation is doing business within the state of Washington frequently arises from different angles, sometimes as to the jurisdiction of the state courts, again as to the assessment of taxes, and, on other occasions, as to the qualification of a foreign corporation to engage in business in this state.

The application of the term "doing business" is not always the same in the instances mentioned.

In connection with acts which constitute engaging in business in a state, the recent decision of the supreme court of the United States in the case of *United States v. Scophony Corp. of America,* 333 U. S. 795, 92 L. Ed. 763, 68 S. Ct. 855, is of interest.

Pursuant to the agreement between respondents and Lindeman, the latter constructed the hop-picking machines in this state, under directions from and supervision by respondents, and placed therein appliances and combinations for which respondents controlled patents. Some parts for the machines were furnished by respondents, and the machines were respondents' property and sold by them to the purchasers. From the evidence, it appears that a considerable number of the machines were sold to purchasers residing in this state, who bought the machines for the purpose of using them within the state.

Respondents employed Mr. Gamache as their agent in this state to collect the deferred payments due pursuant to the contracts with the purchasers and, apparently, to check the use of the machines by the purchasers and act as consultant to the purchasers.

Respondents frequently visited Yakima to inspect the machines and to study the processes followed in constructing them, and deposited their money in a bank in Yakima for the purpose of financing all, or a considerable portion, of the work performed by Lindeman. The parts shipped from California by respondents for use in the machines remained, at all times, respondents' property. All offers to purchase machines were subject to the approval of respondents, who signed the contracts at their Sacramento office. The machines were delivered to the purchasers at Yakima, who would acquire their titles to the machines in this state after making the required payments and accomplishing the contracts.

The money received by Lindeman was deposited to respondents' credit in a Yakima bank. The "royalties" due respondents under the contracts were collected by their

agent in this state and forwarded to respondents. During the years 1940 to 1944, inclusive, respondents received many thousands of dollars as the proceeds of their transactions in the state of Washington.

In the case of *Kernchen Co. v. English*, 70 Pa. Super. Ct. 293, it appeared that the plaintiff, an Illinois corporation, was the owner of a patent covering a type of ventilator, and had not registered in Pennsylvania as a foreign corporation, thereby becoming entitled to engage in business in Pennsylvania. The defendants operated a factory in Pennsylvania, and, for several years, had been making ventilators pursuant to orders from the plaintiff, and shipping them to purchasers in Pennsylvania and other states in accordance with plaintiff's directions.

The plaintiff sued defendants for the price of three ventilators alleged to have been sold by plaintiff to the defendants. The appliances were manufactured by the defendants upon plaintiff's order and pursuant to an agreement between the parties. When manufactured, the ventilators were delivered to plaintiff's vendees, with plaintiff's tags attached thereto. Plaintiff fixed the sale price, and the ventilators could not be manufactured or sold by defendants save on plaintiff's order.

In the trial court, a jury rendered a verdict in favor of the plaintiff, and the trial judge set the verdict aside and dismissed the action on the ground that the plaintiff had not complied with the laws of Pennsylvania by registering as a foreign corporation doing business in that state. The trial court held that plaintiff was doing business in Pennsylvania and, because of its failure to register in that state, could not maintain an action before a Pennsylvania court.

On appeal to the superior court, the judgment was affirmed, the court holding that the plaintiff's operations within the state of Pennsylvania did not involve interstate commerce, and that, having engaged in business in Pennsylvania without registering as a foreign corporation, it could not sue before a Pennsylvania court.

The business operations conducted by the plaintiff were very similar to the course of business followed by respondents in the state of Washington.

■ The trial court erred in holding that respondents were not engaged in business in this state. Our conclusion is supported by the following authorities: *Grams v. Idaho Nat. Harvester Co.*, 105 Wash. 602, 178 Pac. 815; *Dalton Adding Mach. Sales Co. v. Lindquist*, 137 Wash. 375, 242 Pac. 643; *State ex rel. Kerr Glass Mfg. Corp. v. Superior Court*, 166 Wash. 41, 6 P. (2d) 368; *International Shoe Co. v. State*, 22 Wn. (2d) 146, 154 P. (2d) 801 (affirmed 326 U. S. 310, 90 L. Ed. 95, 66 S. Ct. 154, 161 A. L. R. 1057); *St. Louis Southwestern R. Co. v. Alexander*, 227 U. S. 218, 57 L. Ed. 486, 33 S. Ct. 245, Ann. Cas. 1915B, 77; *International Harvester Co. v. Kentucky*, 234 U. S. 579, 58 L. Ed. 1479, 34 S. Ct. 944.

Respondents rely upon cases in which it has been held that the solicitation of business, sales, or contracts, subject to approval or rejection without the state of Washington, is not doing business within this state. The general principle relied upon by respondents is sound, but, when solicitation of patronage is accompanied by other activities within the state, a different situation is presented.

■ Respondents also argue that Lindeman was not their agent, but was an independent contractor.

Laws of 1941, chapter 178, § 2, subd. (j) and (k), p. 485 (Rem. Supp. 1941, § 8370-5 (j) (k)), read as follows:

"(j) The word 'manufacturer' means every person who, either directly or by contracting with others for the necessary labor or mechanical services, manufactures for sale or commercial use from his own materials or ingredients any articles, substances or commodities. When the owner of equipment or facilities furnishes, or sells to the customer prior to manufacture, all or a portion of the materials that become a part or whole of the manufactured article, the Tax Commission shall prescribe equitable rules for determining tax liability;

"(k) The term 'to manufacture' embraces all activities of a commercial nature wherein labor or skill is applied, by hand or machinery, to materials so that as a result

thereof a new, different or useful article of tangible personal property or substance of trade or commerce is produced and shall include the production or fabrication of special made or custom made articles; . . ."

These sections define respondents' situation contrary to their contention.

The trial court erred in awarding respondents judgment against appellant for the recovery of the sums above referred to, which had been paid under protest by respondents. The trial court also erred in reversing, vacating, and setting aside the rulings, orders, and decisions of the tax commission of the state of Washington, from which respondents had prosecuted appeals to the superior court, and in permanently restraining and enjoining the state tax commission from asserting or enforcing tax levies based upon and with reference to hop-picking machine "royalties."

The court also erred in entering the declaratory judgment and decree to the effect that respondents are not and shall not be liable to the state of Washington for any taxes levied with reference to or by reason of the hop-picking machine "royalties," and that respondents were not and are not doing business in the state of Washington.

It appears that the state tax commission had levied certain taxes, in the sum of $238.33, on account of machine parts shipped by respondents from Sacramento to Lindeman, to be used in the manufacture of the hop-picking machines. Respondents contend that this levy resulted, *pro tanto*, in a double taxation against respondents.

As the questions presented before the superior court were determined by that court contrary to appellant's contentions, with the result that the judgment above referred to was entered, there was no precise determination of the amount due appellant from respondents by way of taxes, in case appellant's contentions were found correct and that respondents were liable to pay taxes by reason of their activities above described.

The judgment appealed from is reversed, and the cause remanded to the superior court, with instructions to reopen the case and, upon the record already made before the

superior court and such other evidence as may be introduced by either party or both parties, in accordance with the views herein expressed, determine the amount of taxes due the state, for which respondents are liable, based upon the record herein, as amplified by other evidence, if any be introduced.

MALLERY, C. J., STEINERT, JEFFERS, SCHWELLENBACH, and HILL, JJ., concur.

SIMPSON, J. (dissenting)—I am unable to agree with the majority opinion in holding that the contract entered into between respondents and Lindeman Power Equipment Company, as set out on pp. 695 and 696, did not provide for the payment of royalties.

The majority opinion states: "The case at bar concerns complete, patented, hop-picking machines sold by respondents." True, but why does the majority ignore the other provisions of the contract, which provide that the machine cannot be used except the purchaser pay a royalty? The majority do not contend that the contract is contrary to public policy. All they have done is simply rewritten the contract for the parties.

The contract, valid in itself, provides for the payment of patent royalties for use and not for ownership of the machines. That the owners of patented machines have a right to charge royalties on machines sold is not subject to denial. That proposition is made conclusive by the decisions of the courts in this country.

It is my position that royalties cannot be taxed save in the state of domicile of the owner. It is agreed that the domicile of respondents is in the state of California.

The case of *Newport Co. v. Tax Comm.*, 219 Wis. 293, 261 N. W. 884, 100 A. L. R. 1204, approved by the United States supreme court, which denied certiorari in *Wisconsin Tax Comm. v. Newport Co.*, 297 U. S. 720, 80 L. Ed. 1004, 56 S. Ct. 598, is exactly in point. The plaintiff in that case was a Delaware corporation, licensed to do business in the state of Wisconsin. The question with which the court was concerned was whether the plaintiff owed certain claimed taxes

to the state of Wisconsin, particularly with reference to the profits realized by the sale of certain patent rights arising from inventions made by the company at its manufacturing plant in Wisconsin. That case was not as strong as this in favor of the taxpayer, because here there is no question but that these inventions were made in the state of California and did not arise from any research work or manufacturing activities in this state, although that was the situation in Wisconsin. In passing upon the questions presented, the Wisconsin court said:

"With respect to tangible property, it is well settled that the state may not impose a tax upon real or personal property located beyond the boundaries of the state. *Frick v. Pennsylvania*, 268 U. S. 473, 45 Sup. Ct. 603; *Union Refrigerator Transit Co. v. Kentucky*, 199 U. S. 194, 26 Sup. Ct. 36. With respect to intangibles, the supreme court, in *Blackstone v. Miller*, 188 U. S. 189, 23 Sup. Ct. 277; *Frick v. Pennsylvania, supra; Cream of Wheat Co. v. Grand Forks County*, 253 U. S. 325, 40 Sup. Ct. 558; and other decisions, had intimated that intangible property, unlike tangible property, might have more than one situs for taxation. By a series of decisions, beginning with *Farmers' Loan & Trust Co. v. Minnesota*, 280 U. S. 204, 50 Sup. Ct. 98; *Beidler v. South Carolina Tax Comm.*, 282 U. S. 1, 51 Sup. Ct. 54; *Baldwin v. Missouri*, 281 U. S. 586, 50 Sup. Ct. 436; *First National Bank v. Maine*, 284 U. S. 312, 52 Sup. Ct. 174; the *Blackstone Case* and the cases following it were expressly repudiated. In the *Farmers Loan Co. Case*, it was held that 'while debts have no actual territorial situs, . . . a state may properly apply the rule *mobilia sequuntur personam* and treat them as localized at the creditor's domicile for taxation purposes,' and that they are 'entitled to enjoy an immunity against taxation at more than one place similar to that accorded to tangibles.' In *First National Bank v. Maine, supra*, a resident of Massachusetts died there owning shares in a Maine corporation, most of the property of which was in Maine. A Massachusetts tax was assessed and paid on legacies and distributive shares principally made up of the proceeds of this stock. A like tax was assessed in Maine, from which the amount of the Massachusetts tax was deducted. It was held that the Maine tax was invalid under the due process clause. The court applied the rule of the *Farmers Loan Co. Case* to shares of stock.

While the *Farmers Loan Co., Beidler,* and *Baldwin Cases* all dealt with bonds, notes, and credits, the court pointed out that the rule of immunity from taxation in more than one state was broader than the application thus far made of it. The rule was extended to corporate stocks, and the decision is broad enough to extend the rule to all intangibles. . . .

"It thus appears to be the rule, established by the United States supreme court, and heretofore recognized by this court, that as to nonresidents there may be no imposition of income taxes upon income derived from property or business located without the state; that the situs of such intangibles as corporate stock is the domicile of the owner; that since property of this character, owned by a foreign corporation, is not located within the state of Wisconsin, it is not subject to an income tax levied by this state.

" . . . It seems evident to us that a state may not, by definition, construction, or other process, domesticate a person or corporation in fact domiciled elsewhere, in order to avoid the application of constitutional principles established by the supreme court of the United States relative to jurisdiction for purposes of taxation. To say that it may do so is to contend that the limits of the state's jurisdiction to tax are wholly self-imposed. . . .

"The next contention of the taxpayer is that the profit realized by the sale of patent rights during the year 1928 is not subject to the Wisconsin income tax. The facts with respect to this contention are as follows: In connection with its manufacturing plant in Wisconsin, the taxpayer maintained a research laboratory for the purpose of discovering and perfecting processes, formulae, and methods applicable to its various lines of manufacture. As a by-product of this research, chemists at this laboratory discovered and developed a formula entitled, 'A process of preventing the dissolution of iron and steel in sulphuric acid and pickling baths.' Letters patent were issued to the taxpayer covering this formula. During the years 1927 and 1928, sales of American, Canadian, and European rights to this patent were made to the American Chemical Paint Company, and a net profit realized amounting to $127,052.78. The taxpayer contends that these come under the description of sec. 71.02 (3) (c), which provides that income derived from patent royalties or from the sale of similar intangible property shall follow the residence of the recipient. It is the contention of the state that since the

discovery was the result of ordinary activities of the taxpayer, associated with and indispensable to its manufacturing operations in this state, it falls within the exception to the general rule, for the reason that it has a business situs in Wisconsin. Except for this claim, the contention here is fully governed by what has been said concerning the profit realized from the sale of stock. If this patent did not have a business situs in Wisconsin by reason of the circumstances of its discovery and development, then its business situs, by the terms of the statute, and by rules of law heretofore discussed, was at the residence of the recipient of the income from its sale, and from that point on the matter is governed by the same considerations that are applicable to profits from the sale of stock. The question is a troublesome one. The operation of the research laboratories certainly is closely identified with the manufacturing operations, in the sense that it has for its purpose the perfecting of the final product. While profits from the sale of discoveries made in that laboratory would seem to be somewhat outside the scope of the manufacturing business engaged in, it may reasonably be contended that the incidental discovery of a product or process having no relation to the products usually manufactured, or perhaps no use except in some other trade, might be considered to be one of the normal by-products of its activities. If the incidental discovery in this case resulted in the manufacture of some new product, wholly dissociated from those customarily produced by this company, it might reasonably be held that income from this source was earned by ordinary business operations within the state. The difficulty is created by the fact that the discovery in this case culminated in the issuance of letters patent,—in the creation of intangible property the income from which is by statute given a situs at the residence of the owner or recipient, and which is said by the United States supreme court to have a situs at the domicile of the owner. May this patent be treated, by reason of the place and circumstances of its discovery, as having a situs in Wisconsin? We think not. The taxpayer was not engaged in Wisconsin in the business of dealing in letters patent. The intangible known as a patent had no more existence in Wisconsin than any other intangible has existence at the location of the tangible property to which it evidences rights. We see no way in which the business situs doctrine can be applied to the letters patent."

The same general rule has been adopted by this state. In *Suburban Transp. System v. King County*, 160 Wash. 364, 295 Pac. 124, this court applied the principle contended for by respondents when it stated:

"It is also a well settled general rule of law that personal property is taxable in the district of the residence of its owner. The rule is well stated in the text of 26 R. C. L. 273, as follows:

" '*Mobilia sequuntur personam* was a well established maxim of the common law, and the *situs* of personal property of every description, wherever it was actually kept or located, was held to be at the domicil of the owner and the property was subject to the jurisdiction of the owner's sovereign. The principle was applicable to the taxation of personal property and it was for many years the universally accepted rule that personal property was taxable at the domicil of the owner. While certain exceptions and qualifications to the rule have been developed in recent years, it is still the basic principle on which the taxation of personal property rests, and the law of taxation of personal property depends largely upon the question of domicil, for it is still held that personal property unless it has acquired a definite *situs* in another state or unless other provision is made by statute is taxable to the owner in the city or town in which he lives and has his domicil.' "

Accord: *Pacific Cold Storage Co. v. Pierce County*, 85 Wash. 626, 149 Pac. 34; and *First Nat. Bank v. Maine*, 284 U. S. 312, 76 L. Ed. 313, 52 S. Ct. 174, 77 A. L. R. 1401.

As I have indicated before, the patent royalties were not part of the selling price. The written agreement between respondents and Lindeman Power Equipment Company, clearly indicates that it contained two contracts in one instrument; first, the contract for the sale of the machine; and, second, a license contract for the use of patents embodied therein, and an agreement to pay royalties to respondents in consideration therefor.

Bearing upon this question is the uncontradicted testimony given by Mr. Thys:

"Q. Was there ever any intention on your part, or the part of Thys & Miller, that these royalties should be deemed or considered part of the purchase price, selling price of

these hop picking machines? A. No. Title to the machines *were* given regardless of the payment of royalties. Q. Under these contracts when was the title to these machines passed to the purchasers of the machines? A. At the time the machines were delivered, and they were delivered when the purchaser made his last payment on the machine. Q. You never have filed any of these contracts as conditional sales contracts or anything of that kind, have you? A. No. Q. You never have considered you reserved any title or interest in the machine after delivery, have you? A. No. . . .

"Q. Do you, or Thys & Miller, have or claim, or have you ever claimed any interest in these machines that have already been delivered to hop growers? A. No. Q. Were these actually bona fide sales of these machines that were entirely completed and consummated when the machines were delivered? A. Yes, certainly. Q. The only things that you, by reason of the patents, you claim certain royalties as provided in the contract? A. That is right. Q. Has any machine ever been delivered to a purchaser or hop grower unless the full amount of the purchase price was paid, either prior to or at the time of the delivery of the machine? A. No. Q. That is, it has always been paid either then or previously? A. Yes. . . .

"Q. When you say the interest you had in the use of the machine, did you ever have or claim any interest in the machine itself after it was delivered? A. No, not in the machine. Q. You were interested in receiving later royalties? A. Yes."

Mr. Julius Bauman, respondents' general manager, testified:

"Q. Are these royalties considered part of the purchase price of the hop picking machine? A. No. Q. When is the final payment of the purchase price of the hop picking machine paid? A. It is made at the time of delivery of the machine to the grower. Q. Has Thys & Miller ever had or claimed any interest in any of these hop picking machines after the delivery of the machine and making of that payment at that time? A. No. Q. The claim for royalty was based on these patents held by Thys & Miller, was it? A. That is correct."

In *Rotorite Corp. v. Commissioner* of *Internal Revenue,* 117 F. (2d) 245, the court recognized the distinction be-

tween patent royalties and purchase-money payment. In that case, it appears that the license contract contained an option for the licensee to purchase a patent. During the tax year, the licensee exercised the option and purchased the patent. The court held that the payments made during the year were, therefore, purchase-money payments rather than royalties, and were not taxable as income to payee. In doing so, the court recognized the fundamental distinction between royalties and purchase-price payments.

It seems to me that *Bloxom v. Henneford,* 193 Wash. 540, 76 P. (2d) 586, directly supports my contention. In discussing the revenue act under question here, we stated:

"The purchase price, as that phrase is employed in the definition of gross earnings in § 8, chapter 180, Laws of 1935, means the purchase price paid by the jobber to the person from whom he bought the goods. The cost of transportation to the purchaser's place of business, whether freight, drayage, or other costs paid by the purchaser after he bought the goods, can not, without doing violence to the language of the statute, be included within the phrase 'purchase price.' It should be borne in mind that the cost of transportation and other costs are paid on the goods by the jobber after the jobber becomes the owner. The statute does not provide that the jobber shall be entitled to a deduction from his gross sales of the *cost* of the merchandise to him. The statute specifically, definitely limits the deduction or exemption to only one kind of cost—the purchase price.

"The tax imposed is an occupation tax for the act or privilege of engaging in business activity. It is measured by a percentage of the respondents' gross proceeds of sales less a deduction or *exemption* of the amount of the purchase price paid by the respondents for the agricultural products purchased by them. The costs or charges paid by the jobber to the railroad company or to the refrigerator car company do not come within any fair definition of the phrase 'purchase price.' "

It seems clear to me that, if the freight and cost of transportation of imported fruit, paid by the purchaser subsequent to the foreign purchase thereof, does not constitute a part of the purchase price, even though exceeding the original cost, it must follow that the royalties subsequently

paid by the purchasers of the hop-picking machines could not constitute part of the purchase price or selling price within the meaning of the same revenue act. Accord: *Ford J. Twaits Co. v. Utah State Tax Comm.*, 106 Utah 343, 148 P. (2d) 343; *Whitehill Sand & Gravel Co. v. State Tax Comm.*, 106 Utah 469, 150 P. (2d) 370; *Dain Mfg. Co. v. Iowa State Tax Comm.*, 237 Iowa 531, 22 N. W. (2d) 786; and *Standard Oil Co. v. State Tax Comm'r*, 71 N. D. 146, 299 N. W. 447, 135 A. L. R. 1481.

The respondents in this case will certainly have to pay an income tax the same as we have here, at the place of their domicile, this tax being based upon the royalties they received from Lindeman Power Equipment Company and the various other purchasers of the hop-picking machines in the state of Washington. That will make a double taxation. Their only recourse, of course, is to appeal to the United States supreme court.

ROBINSON and MILLARD, JJ., concur with SIMPSON, J.

